488 So.2d 1002 (1986)
LOUISIANA STATE BAR ASSOCIATION
v.
Sanford KRASNOFF.
Nos. 85-B-0204, 84-B-1217.
Supreme Court of Louisiana.
May 20, 1986.
*1003 Thomas O. Collins, Jr., Wood Brown, III, New Orleans, Robert J. Boudreau, Lake Charles, Sam J. D'Amico, Baton Rouge, Carrick R. Inabnett, Monroe, Harold J. Lamy, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pee, Metairie, Roland J. Achee, Shreveport, Gerard F. Thomas, Jr., Natchitoches, for applicant.
Irvin R. Sanders, Jack C. Benjamin, New Orleans, for respondent.
DENNIS, Justice.
The Louisiana State Bar Association, acting through its Committee on Professional Responsibility, brought these suits to expel Sanford Krasnoff from the legal profession. The respondent Krasnoff resisted, and several hearings were conducted before commissioners and the Committee. After considering all of the pleadings, the evidence, and the written and oral arguments, we find that the respondent Krasnoff committed several disciplinary rule violations and is morally unfit to continue in the practice of law.

A. The Larson Case

Pleadings
The Committee charges respondent Krasnoff with violations of disciplinary rules 1-102(A) and 9-102 in that he (a) failed to deposit in a separate client's trust account $36,094.22 of his client's funds resulting from the settlement of her personal injury claim; (b) fraudulently appropriated these funds to his own use; and (c) refused to deliver the funds to his client upon her request although she was clearly entitled to receive them.

Evidence
In May, 1977, Annabelle Larson employed Sanford Krasnoff to assert her claim for personal injuries arising from a December, 1976 accident in which she fell through a wharf. Krasnoff filed suit on the claim on December 15, 1977. In September, 1982, he received $55,000 from two insurance companies in settlement of Mrs. Larson's claim, but she agreed to let Krasnoff keep the money until May 1, 1983. Krasnoff deposited the settlement proceeds in his firm's operating account; he did not have an identifiable client's trust account separate from his operating account. Beginning in May, 1983, Mrs. Larson made repeated requests for her funds. She employed attorneys who made demands and one lawyer filed suit. After receiving a disciplinary complaint, the Committee on Professional Responsibility initiated a disciplinary proceeding and conducted several hearings. Despite these actions Krasnoff did not pay Mrs. Larson until September 23, 1985.
Mrs. Larson testified that she agreed to a settlement in September, 1982 under which she would receive deferred payment in May, 1983 because Krasnoff told her the insurance companies would pay more for such an arrangement; however, the attorneys who represented the insurance companies testified that payment was not deferred, that the settlement was a standard one with contemporaneous payment. Krasnoff testified that he had indeed received the $55,000 at the time of the settlement, but he contended that Mrs. Larson requested *1004 that he hold her funds until May 1, 1983 for an unspecified tax related purpose. The credibility of Krasnoff's testimony is undermined by several factors, however. He conceded that Mrs. Larson's personal injury settlement proceeds were not taxable and that he advised her of this probably more than once. He could not describe the tax problem over which he said Mrs. Larson was concerned, or how the deferred payment would help her. Mrs. Larson apparently did not enjoy a large income or have any reason to be interested in tax shelters or deferrals. The record does not suggest any reason she would have for lying about what Krasnoff had told her. On the other hand, in the cases discussed in this opinion, Krasnoff displays a penchant for explaining questionable conduct as being motivated by vague fears of untoward tax consequences or Internal Revenue Service misconduct. For these reasons, we find it highly probable that Mrs. Larson testified truthfully, that Krasnoff deceived her into letting him keep her money, and that he intended to use it to his own advantage.
Krasnoff testified that he did not maintain a separate client's trust account as required by the disciplinary rules. His explanation for this was somewhat involved: The Internal Revenue Service had caused his bank accounts to be levied upon in the past. Because of the IRS action the state revenue department began to file liens against his accounts. The IRS had afterwards informed him he could have just one account that would be safe from seizure. Therefore, Krasnoff stated, he adopted the practice of using one account as an operating account and keeping clients' funds in a safe in cash. In fact, Krasnoff testified he customarily kept approximately $100-200,000 cash in his office outside the safe and frequently $200-300,000 cash in his safe. Krasnoff said he straightened everything out with the IRS by 1980 but did not resolve his state tax problems until February, 1985.
Following his normal practice, Krasnoff testified, he deposited the insurance company checks for $55,000 in the Larson settlement in his operating account, withdrew $32,640.00 from his office cash and put this bundle of currency in his safe with Mrs. Larson's name attached. He stated that the $36,094.22 represented the $55,000 settlement less a 40% fee, which had been agreed upon, less $572.45 expenses incurred and $212.45 unpaid expenses.
Mrs. Larson requested payment from Krasnoff in May 1983 as he had led her to expect. Krasnoff explained that he failed to pay her then because he offered to reduce his fee from 40%, as they had agreed, to 331/3%, if she would give him time to have his CPA check out the tax consequences of his benevolence. He testified that she agreed to wait but soon thereafter resumed her demands. After this, Krasnoff stated he refused to accede to the demands by Mrs. Larson, and later her attorneys, because she had increased her claim to include interest and attorney's fees. Afterwards, Mrs. Larson dropped her demand for interest and attorney's fees, but Krasnoff then refused to pay her unless she and her attorneys came to his office and entered into a written release of all claims. At the commissioner's hearing, it was suggested to Krasnoff that he could simply write the release on a check as a condition of his transfer of the funds due to his client. But Krasnoff testified that he would insist on a meeting with Mrs. Larson and her attorney to draft a release. On September 23, 1985, several months after the Commissioner's hearing on June 7, 1985, and three years after the September 1982 settlement, Krasnoff paid Mrs. Larson $36,094.22.
During the Commissioner's June 7, 1985 hearing, the attorney for the Committee requested that Krasnoff open his safe and allow an inspection of Mrs. Larson's funds. Krasnoff agreed to an examination of her funds but said he would not permit a general inspection of the safe's contents. Krasnoff led the Commissioner and others to the safe, which had been moved one month earlier to his residence, opened it and displayed a packet of currency with Mrs. Larson's name affixed. Krasnoff offered *1005 to let the Committee's attorney count the money, but he declined. At this time Krasnoff informed the commissioner he had added $3600 to Mrs. Larson's bundle of cash back on May 2, 1983 when he offered to reduce his fee.
Of course, the demonstration did not prove that the correct amount of money owed to Mrs. Larson had been kept in the safe for almost three years preceding the inspection. Krasnoff had been forewarned that he might be asked to display the funds by a similar request at a previous hearing involving a different client. At that time, Krasnoff professed willingness to comply but was unable to locate some keys he said were necessary to open the safe. Krasnoff's whole story involving IRS harassment and an office and safe filled with as much as $500,000 cash seems highly improbable. Krasnoff emphatically stated he would not allow an inspection of the entire safe, which would have been necessary to corroborate his testimony. He did not offer an inspection of his office. Furthermore, it is hard to believe that any attorney would perpetrate such folly, considering the significant loss of interest income involved in warehousing huge sums of cash, the great uninsurable risk to the security of the money, and the graver danger to the life and limb of the lawyer, his family and his employees from burglars, robbers and extortionists.
For these reasons, and the reasons which make Mrs. Larson's testimony more credible than Krasnoff's with regard to the deferred payment, we are not convinced that Krasnoff kept Mrs. Larson's $36,094.22 idle in his safe from September, 1982 until September 23, 1985. Indeed, when an attorney relies upon a "black box" defense, viz., that he kept client funds secretly but securely in a private safe or similar unregulated depository, the likelihood of actual embezzlement is so great, and the policy of professional responsibility in protecting the client from such risks so strong, that it should be presumed that the attorney is guilty of embezzlement unless he successfully carries both the burden of going forward with the evidence and the burden of persuasion otherwise. See, Louisiana State Bar Association v. Whittington, 459 So.2d 520 (La.1984); Louisiana State Bar Association v. Weysham, 307 So.2d 336 (La.1975). It is unnecessary to rely on such a presumption in this case, however, because the committee proved to our satisfaction with clear and convincing evidence that Krasnoff misappropriated Mrs. Larson's funds to his own use.
Disciplinary Rules and Legal Precepts
The Louisiana Code of Professional Responsibility, DR 9-102(A) & (B) provides:
(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
(1) Funds reasonably sufficient to pay bank charges may be deposited therein.
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
(B) A lawyer shall:
(1) Promptly notify a client of the receipt of funds, securities, or other properties.
(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.
(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession *1006 of the lawyer and render appropriate accounts to his client regarding them. (4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.
An attorney violates DR 9-102 when he (1) fails to deposit funds wholly or partially belonging to his client in a separate clients' trust account, (2) withdraws funds from the clients' trust account which are not due him beyond any dispute, (3) fails to deliver to his client as requested funds which the client is entitled to receive, (4) fails to promptly notify a client of the receipt of funds, securities, or other properties, (5) fails to identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable, or (6) fails to maintain complete records of all funds, securities, and other properties of a client coming into possession of the lawyer and render appropriate accounts to his client regarding them. See DR 9-102, Louisiana Code of Professional Responsibility. The attorney's misconduct may be offset by mitigating factors, such as mistake, good faith, or lack of conscious wrongdoing; however, these factors do not negate the infraction. All relevant factors, including the attorney's state of mind, are considered in determining the seriousness of the violation as a reflection of the moral character of the attorney. Louisiana State Bar Association v. Hinrichs, 486 So.2d 116 (La.1986); Louisiana State Bar Association v. Robinson, 485 So.2d 501 (La.1986).
Further, in Hinrichs this court set forth some general guidelines for evaluating violations of DR 9-102 for the purpose of imposing sanctions. In describing a typical case in which the attorney should be disbarred we stated that one or more of the following elements are usually present: the lawyer acts in bad faith and intends a result inconsistent with the client's interest; the lawyer commits forgery or other fraudulent acts in connection with the violation; the magnitude or the duration of the deprivation is extensive; the magnitude of the damage or risk of damage, expense and inconvenience caused the client is great; the lawyer either fails to make restitution or does so tardily after extended pressure of disciplinary or legal proceedings. Louisiana State Bar Association v. Hinrichs, 486 So.2d 116 (La.1986); Louisiana State Bar Association v. Atkins, 440 So.2d 106 (La.1983); Louisiana State Bar Association v. Jordan, 375 So.2d 89 (La. 1979); Louisiana State Bar Association v. Philips, 363 So.2d 667 (La.1978); Louisiana State Bar Association v. Weysham, supra.

Conclusion
Krasnoff committed several violations of DR 9-102. He failed to deposit funds belonging to his client in a separate clients' trust account. Aside from his failure to establish and properly use such an account, Krasnoff violated the rule by withdrawing from the bank funds of the client which were not due to him and appropriating the funds to his own use. Finally, he breached the rule by failing to deliver to his client as requested funds which she was clearly entitled to receive.
We reject respondent's arguments that disciplinary violations may be excused or greatly mitigated by an attorney's previous difficulties with the Internal Revenue Service or by what the attorney considers the unreasonable demands of his client. Under its inherent power and its original jurisdiction this court has the supreme authority to regulate the practice of law by court rules or by adjudication as cases may arise. Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982); Singer Hutner Levine Seeman & Stuart v. Louisiana State Bar Association, 378 So.2d 423 (La.1979). Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La.1979) Louisiana State Bar Association v. Edwins 329 So.2d 437 (La.1976); Ex Parte Steckler, 179 La. 410, 154 So. 41 (1934); Meunier v. Bernich, 170 So. 567 (Orl.App. 1936). Pursuant to these powers, this court adopted and promulgated the Louisiana *1007 Code of Professional Responsibility. Rules of Supreme Court of Louisiana, Rule 19 (1973). The rules and standards governing the conduct of attorneys unquestionably have the force and effect of substantive law. Saucier v. Hayes Dairy Products, Inc., supra; Louisiana State Bar Association v. Connolly, 201 La. 342, 9 So.2d 582 (1942); Ex parte Steckler, supra. Accordingly, an attorney must obey the disciplinary rules under all circumstances, and his infractions cannot be justified or greatly mitigated by either ignorance or personal adversity. Thus, Krasnoff's unpleasant experiences with the Internal Revenue Service and his dispute with his client cannot excuse or extenuate his failures to deposit his client's funds in a separate client's trust account, to refrain from withdrawing or using client funds unless due him beyond dispute, and to deliver funds owed his client when requested.
The facts of this case involve most of the factors contained in the category of cases justifying disbarment outlined above. Krasnoff's actions were in bad faith and intentionally inconsistent with his client's interests, the deprivation was extended in magnitude and duration, the risk of damage, the expense and the inconvenience caused the client were great, and restitution was made only after extended legal and disciplinary proceedings. Accordingly, the respondent's misconduct in this case alone requires his expulsion from the legal profession, but the pattern which emerges from this and the following two cases confirms that disbarment is necessary.

B. The Gonzales Case

Pleadings
The committee alleges that respondent Krasnoff violated disciplinary rules 1-102, 6-101(A)(3) and 9-102 in that he (a) failed to deposit in a separate client's trust account some $2,200 of his client's funds resulting from the settlement or handling of her personal injury claim, and (b) refused to either deliver the funds to his client or to pay medical bills with them upon her request although she was clearly entitled to receive them.

Evidence
On March 14, 1979, Krasnoff was retained to assert the personal injury claims of Ruth Gonzales and her grandchildren arising out of a March 3, 1979 automobile accident. On March 3, 1980 Krasnoff filed suit for his clients against the other motor vehicle operator involved in the accident, that motorist's liability insurer and Mrs. Gonzales' liability and uninsured motorist carrier. On February 22, 1980, Krasnoff received $10,000 in settlement of the clients' claims against the defendant and the liability insurer. Krasnoff retained $1,293.89 to pay Mrs. Gonzales' medical bills owed the De La Ronde Family Practice Center plus a small sum to pay miscellaneous expenses and disbursed the balance of the settlement proceeds to his clients. On January 5, 1981 Krasnoff received $1,000 in medical benefits for Mrs. Gonzales from her own insurer.
Krasnoff used a power of attorney to endorse the insurance company checks and deposit them in his law firm's operating account. As observed in the Larson case, Krasnoff did not maintain a separate clients' trust account. Although Mrs. Gonzales repeatedly called Krasnoff's office and requested that he pay the medical bills owed to De La Ronde Family Practice Center and pay her the $1,000 he had collected, Krasnoff failed to do so. Mrs. Gonzales employed another attorney to enforce her claims against Krasnoff. The attorney wrote Krasnoff on August 13, 1980 and requested an accounting. Finally, in September, 1982, some two and one half years after receiving the money, Krasnoff paid the $1,293.89 he retained to the De La Ronde Family Practice Center. By this time, the medical center had assessed Mrs. Gonzales with late charges of $649.23 upon which she was paying installments of principal and interest monthly.
At the February 15, 1985 Commissioner's hearing Krasnoff offered the same excuses he gave in the Larson case for commingling client funds with his firm's operating funds and for his failure to set up a separate *1008 client's trust account. He explained his unauthorized retention of his client's funds as follows: He continued to withhold payment from the De La Ronde Family Practice Center in a futile attempt to persuade the center to waive the growing late charges. He failed to explain why he did not pay the amount withheld for medical bills immediately upon settlement. As for the $1,000 collected from Mrs. Gonzales' insurer, he claimed that she still owed him a 40% fee therefrom. He failed to explain why he had not remitted at least 60% of the $1,000.
In view of Krasnoff's consistent pattern of collecting and holding client funds under questionable circumstances, and his endless excuses for not performing his professional duties, we find that it is highly probable that Krasnoff intentionally acted contrary to his client's interests simply for the purpose of using her money. In any event, his continued inaction in the face of her requests that he make payment to the medical center and deliver her funds was inexcusable.

Conclusion
Respondent's violations are similar to those in the Larson case, except that the magnitude of the deprivation and damage to the client is less. Krasnoff failed to deposit client funds in a separate trust account, he withdrew and used client funds to which he was not entitled, and he refused to deliver funds owed to a client or to pay her medical bills as she requested. Included within the client's damages caused by respondent's violations were the late charges of $649.23. Because disbarment is warranted by the Larson case and confirmed by the other cases, we will not fix an independent sanction in the Gonzalez case.

C. The Cummins Case

Pleadings
The committee charges respondent with violations of disciplinary rules 1-102, 6-101(A)(3), and 9-102 in that he (a) failed to deposit in a separate client's trust account $15,000 belonging in part to his client and in part to himself resulting from his client's community property settlement; (b) withdrew and used for his own purposes in excess of $13,500 of these funds; and (c) refused to deliver the funds to his client upon her request although she was clearly entitled to receive them.

Evidence
In 1967 Mrs. Alice Cummins employed Krasnoff to represent her in a divorce proceeding and community property settlement. Under the terms of the settlement, Mrs. Cummins was to receive $15,000. Krasnoff persuaded her to allow him to manage the funds and deposited the entire $15,000 in a savings and loan account bearing the name "Sandford Krasnoff for the use and benefit of Alice T. Schiendorf." Between 1967 and 1981 funds were withdrawn from and deposited to the account by Krasnoff or his employees. Judging from the activity and size of transactions, it is evident that Krasnoff both deposited his own funds in the account and made use of the funds as his own. Mrs. Cummins testified that Krasnoff had given her money from the account when she needed it and calculated that she had received a total of $12,615.35. On January 1, 1981 Krasnoff closed the account by withdrawing the balance of $1,012.86. During the existence of the account Krasnoff did not give Mrs. Cummins an accounting of her funds although she requested one several times. In 1982 she was audited by the Internal Revenue Service primarily because she could not furnish an accounting of the interest accrued on the account.
At the formal investigatory hearing Krasnoff testified that he placed the $1,012.86 obtained upon closing the savings and loan account in his office safe with Mrs. Cummins' name affixed. At the Commissioner's hearing he testified that this money would be applied to pay his fee but that it was still in his safe. After the hearing, however, he wrote to the Commissioner stating that the money was no longer in his office safe because after the formal investigatory hearing he had elected to *1009 treat the money as his fee in Mrs. Cummins' case.

Conclusion
A lawyer must deposit all funds of a client paid to him, other than advances for costs and expenses, in an identifiable client's trust account. No funds of the lawyer or his firm shall be deposited therein except those necessary to pay bank charges. Funds belonging in part to a client and in part to a lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or firm may be withdrawn when due unless the right to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved. DR 9-102(A), Louisiana Code of Professional Responsibility. A lawyer must maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them. DR 9-102(B)(3), Louisiana Code of Professional Responsibility.
Krasnoff clearly violated the disciplinary rules by (a) depositing his client's funds in a savings account under his own name, rather than in an identifiable client's trust account; (b) withdrawing funds belonging to the client for his own use; and (c) failing to maintain complete records of his client's funds and to render appropriate accountings to his client.
The violations are serious and reflect unfavorably upon the respondent's sense of professional responsibility, although they were not as damaging as some of his other offenses. The savings account was not identifiable as a client's trust account and left no paper trails to the sources or destinations of its funds which would facilitate the maintenance of complete records of all funds or the rendition of appropriate accounts to the client. Mrs. Cummins was caused inconvenience but apparently no damage by the tax audit which resulted in part from Krasnoff's failure to render accountings. Although Krasnoff collected his fee irregularly, without rendering a statement or accounting, the amount charged does not appear to be excessive. Because substantially all of Mrs. Cummins funds, less reasonable attorney's fees, were paid to her in response to her requests over the years, it does not appear that the magnitude of the deprivation or damage to the client was as great in this case as in the others. Nevertheless, these violations tend to confirm our judgment that the respondent is not morally fit to continue to be entrusted with the privileges and responsibilities of the legal profession.

Decree
For the foregoing reasons, it is ordered, adjudged and decreed that the name of Sanford Krasnoff be stricken from the Roll of Attorneys and his license to practice law in the State of Louisiana be revoked and cancelled at respondent's cost.
ATTORNEY DISBARRED.
CALOGERO and MARCUS, JJ., concur in part and dissent in part, believing that a lengthy suspension from the practice of law would constitute sufficient discipline in this matter.